UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRADLEY PETERSON,

                    Plaintiff,           Case No. 12-11460
                                      Honorable Mark A. Goldsmith
v.                                      Magistrate Judge David R. Grand

MONROE COUNTY, TIME LEE,
JULIE MASSENGILL, AND RAMONA
TALLY,

                    Defendants.
_____/

**REPORT AND RECOMMENDATION TO GRANT DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [32] AND TO DENY
PLAINTIFF'S MOTION TO AMEND HIS COMPLAINT [27]**

      Before the court are Defendants' motion for summary judgment [32] and the Plaintiff's motion to amend his complaint [27].  An Order of Reference was entered on May 20, 2013, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. §636(b).  [26].  Having reviewed the pleadings and other papers on file, the Court finds that the facts and legal issues are adequately presented in the parties' briefs and on the record, and it declines to order a hearing at this time.

**I.**      **RECOMMENDATION**

      For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' motion for summary judgment [32] be **GRANTED**, that Plaintiff's motion to amend his complaint [27] be **DENIED**, and that Plaintiff's complaint be **DISMISSED**.

**II.**      **REPORT**

      **A.**      **Factual Background**

On December 10, 2009, Plaintiff Bradley Peterson was arrested and charged with Assault

with a Dangerous Weapon (Felonious Assault) and booked in to the Monroe County Jail (the "Jail"). [32, Ex. A]. This is principally a civil rights action brought by Plaintiff against Defendants Monroe County, Tim Lee, Julie Massengill, and Ramona Talley[1] related to incidents which occurred while he was being held at the Jail as a pretrial detainee.[2] During all relevant times, Lee and Massengill were corrections officers, and Talley was a Sergeant, at the Jail and/or Monroe County Sheriff's Department. (Cplt. ¶ 3).

### i.        The January 30, 2010 Incident

Peterson claims that during a prior incarceration at the Jail he had been permitted to place his mattress on the hallway floor outside his cell for sleeping purposes, and assumed he would have the same privilege during this subsequent detention there. [32, Ex. B at 19-20]. Accordingly, rightly or wrongly, on the morning of January 30, 2010, Peterson was sleeping on his mattress in the G Unit on the hallway floor outside of his cell. [Cplt. ¶ 10; 32, Ex. I]. Lee, a corrections guard, testified that he approached Peterson that morning and asked him to get up. [32, Ex. L at 15]. Peterson alleges that Lee then "deliberately and intentionally kicked Plaintiff in the head for no justifiable reason whatsoever." (Cplt. ¶ 11). At his deposition, Peterson testified as follows regarding the incident:

> Q.    Were you asleep when [the kick to your head] happened?
> A.    Yes, I was.
> Q.    When did you wake up?
> A.    When he [Lee] put the boot to my head.
>              * * *

---

[1] While Peterson names "Ramona Tally" as a defendant in this matter, it appears from the other records in this case that her last name is "Talley."

[2] When Peterson filed his complaint, and throughout most of the discovery period, he was represented by counsel. On May 13, 2013, the Court granted his counsel's motion to withdraw [25], and Peterson has represented himself *pro se* since that time. On May 20, 2013, Peterson filed a motion to amend his complaint in which he sought to add new parties on claims unrelated to those alleged in his original complaint. [27].

2

Q.    And did it feel like a glancing blow or a direct blow to the top middle of your head?

A.    Felt like a direct blow.

Q.    Did you say anything?

A.    I threw my hands up because I was angry at the time and being startled, being woke up like that.  I didn't know if it was an inmate or what was going on.  All I know is I have a head injury that I try to protect to the best of my abilities.

                        * * *

Q.    Immediately after feeling something strike the top of your head did you look up?

A.    Yeah, I got up, I raised up.  I didn't look up, I raised up.

Q.    So you got up off the mattress immediately?

A.    Right, because I didn't know who did it.  I didn't know if another inmate booted me in my head or not?

[32, Ex. B at 28-29, 32].

Exhibit E to Defendants' motion is a video of the incident.  [32, Ex. E].  The Court has viewed the video multiple times and finds that it simply does not comport with Peterson's testimony.  At 7:18:27 of the video, Lee is seen approaching the mattress where Peterson was sleeping outside his cell and kicking towards it with his right foot in an unaggressive manner which could aptly be described as a nudge.  While one cannot tell with absolute certainty from the video whether Lee made contact only with the mattress and/or with some part of Peterson's body, the video footage is clearly inconsistent with his testimony about the severity of the kick and his reaction to it; the video shows that Peterson did not make any quick or startled movement and did not "immediately" get up.  Indeed he appears not to have moved at all for about 30 seconds (until about 7:19:06 of the video).[3]  During that time, Peterson, still laying down and virtually still, appears to be discussing something with Lee.  When Peterson did stand up, around

---

[3] The Court notes that the video fast forwards from 7:18:34 to 7:18:40.  However, Peterson appears to be laying in the exact same position at the 7:18:40 mark as he was before the video skipped.  And, he appeared to make no movement whatsoever between 7:18:27 and 7:18:34.

3

7:19:18, Lee took the mat, and Peterson then freely moved about the lockup area, interacted with other inmates, and was not in any apparent distress.

Later that morning, Peterson made a report about the incident, claiming that Lee had kicked him in the head. [32, Ex. F]. He was seen that same morning by Defendants Massengill and Talley. Massengill completed a report in which she observed: "No visible signes [sic] of trama [sic]. No bruising. No abraisian [sic]. No lumps. No swelling. Checked by CO Massengill and Sgt. Talley." [*Id.*]. Peterson admits that he was given aspirin. [Cplt. ¶15; 37 at 3]. Defendant Talley also completed a report in which she stated that she "did not see any visible bruising, swelling, abrasion or lumps. Inmate Peterson's skin in the area he was pointing to appeared to be normal." [32, Ex. G]. Talley had offered to move to Peterson to a "medical cell," where he could apparently recuperate better from any alleged injuries, but he rejected that suggestion, indicating that he did not need medical attention and that he preferred to stay in his G Unit. [*Id.;*Ex. B at 38; Ex. G; Ex. M at 34-43; Ex. N at 17-20, 25-28, 49].[4] Peterson alleges that he was without his mattress for four days, and had to lie on the "freezing cold" cell floor to sleep during that period of time. (Cplt., ¶ 16).

### ii.     The June 14, 2010 Incident

Throughout his time at the Monroe County Jail, Peterson was assigned and re-assigned to various "dayrooms." [32, Ex. I]. In at least some instances, Peterson's re-assignments were made as a result of confrontations he had with other inmates. [32, Ex. J, p. 3) (noting that "Inmate Peterson was moved out of dayroom G and re-classified to J-9 for issues he was having in the dayroom.")]. Between April 10, 2010 and May 6, 2010, Peterson had been housed in the

---

[4] Peterson alleged in his complaint that he "requested that he be taken to receive medical treatment," but that request was denied by Talley and Massengill. (Cplt. ¶ 15). However, at his deposition Peterson admitted that Defendants suggested he go the "medical unit," but that he had objected to going there. [32, Ex. B at 38].

K Unit.  [32, Ex. I].  However, due to "tension in dayroom K," Officer Jan Ford (who Peterson did not name as a defendant), transferred Peterson into G Unit.  [*Id.*].  Peterson admits that he did not submit a kite asking to be moved out of G Unit.  [32, Ex. B at 145].  More than a month went by with Peterson being held in G Unit when, on June 14, 2010, Peterson claims he was attacked, unprovoked, by two inmates with whom Peterson had not had prior issues.  [*Id.* at 70-76].[5]  He claims to have suffered black eyes and a "busted lip" at the hands of the first assailant, but admits that he gained control of the inmate, punched him and "probably" gauged his eyes.  [*Id.* at 73-74].  The second inmate allegedly punched Peterson in the ribs.  [*Id.* at 70-76].[6]  A report indicates that Peterson did not request any medical treatment, and indeed was attempting to hide his injuries from the guards so that he could later attack one of the assailants, though Peterson denies this.  [32, Ex. B at 88; Ex. O at 3, 15-16].

Regardless, either late in the evening on June 14th or early in the morning on the 15th [Ex. O (listing incident time as 0038 hrs)], Peterson was at the top of the stairs and swung at the inmate who had hit him in the ribs, leading to another fight between the two.  [32, Ex. B at 70, 88-90; Ex. O].  According to a report, Peterson indicated that he did not want to press charges against the other inmate, but did request medical attention.  [32, Ex. O at 3].[7]  A "medical protocol" was conducted on Peterson at 4:04 a.m. on June 15th, where he received medical

---

[5] In his complaint, Peterson alleges merely that "Defendants placed and/or had Plaintiff placed in a cell unit [G] with physically abusive inmates who attacked and brutalized [him] on or about June 14, 2010."  [Cplt. at ¶ 17].

[6] Despite the significant time gap between Peterson's transfer into G Unit and his being assaulted by the inmates [*id.*], and despite the fact that Peterson admitted he had never been in a fight with the other inmates [*id.* at 75-76], Peterson appears to claim that his transfer into the Unit amounted to either an unconstitutional condition of confinement or at least negligence.

[7] Peterson testified that following this second fight, he was placed in an isolation cell overnight and that he begged unidentified officers to go to the hospital because he "couldn't hardly breathe."  [32, Ex. B at 91].

attention to wounds on his face and arm.  [*Id.* at 4, 14].  Records reflect that at 5:45 a.m., Peterson was seen by Officer Juanita Belair and he requested to go to the hospital because "his side hurt from being punched."  [*Id.* at 15].  Records also reflect that later that morning Peterson saw a jail nurse and was then transported to a hospital for x-rays of his ribs.  [*Id.* at 16].  He was then returned to the Monroe County Jail.  [*Id.*].  However, he promptly was taken back to the hospital where he stayed for five days receiving treatment for his injuries.  [*Id.*; 32, Ex. B at 91-92].[8]

### iii.    Peterson's Complaint

On March 30, 2012, Peterson filed his complaint in this matter alleging "violations of [his] federal constitutional rights as secured by the Eighth and Fourteenth Amendments of the United States Constitution," as well as state law gross negligence claims.  (Cplt. ¶ 5).  More specifically, in Counts I and III, Peterson alleges that Defendant Lee violated his Eighth Amendment rights and his Fourteenth Amendment Due Process rights by using excessive force when kicking him in the head on January 30, 2010.  In Counts II and IV, Peterson alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Fourteenth and Eighth Amendments.  In Count V, Peterson challenges, under the Eighth Amendment, the allegedly "inhumane" "conditions of confinement" he was subjected to at the Monroe County Jail, though he does not specify any condition in particular.  Count VI of Peterson's complaint is entitled "Monroe County's Constitutional Violations."  Peterson alleges that the County "acted recklessly and/or with deliberate indifference when it practiced and/or

---

[8] Peterson claims it was the hospital that requested his return, while Defendants claim that a jail nurse who received Peterson's x-rays "immediately contacted [Talley] and advised [her] that Inmate Peterson needed to be transported back to the ER for treatment …"  [*Id.*].  Although the documentary record [*e.g., id.* at 16-18] is consistent with Defendants' position, any factual dispute is immaterial to the resolution of this motion.  Either way, Peterson was promptly returned to the hospital and received extensive medical care.

6

permitted customs and/or policies and/or practices that resulted in constitutional violations to Plaintiff." However, the only purported "custom," "policy" or "practice" identified by Peterson is the County's alleged failure to train and/or supervise its officers in the use of excessive force. In Count VII Peterson alleges "gross negligence" by each of the individual Defendants, though he does not identify any conduct in particular which he is challenging.

On July 5, 2013, Defendants filed the instant motion for summary judgment as to each of Peterson's claims. [32]. They argue that the excessive force claims against Lee should be dismissed as his actions amounted to, at most, *de minimus* force. They argue that Peterson's deliberate indifference claims fail because his injuries did not evidence a "serious medical need" and because he was provided medical treatment. They also seek dismissal of Peterson's state law claims, arguing that he cannot satisfy the elements of those claims.

Peterson filed a response on July 30, 2013. [37]. However, Peterson, for the most part, simply re-asserts the allegations in his complaint. As to the January 30, 2010 incident, he simply asserts that Lee kicked him in the head and that he was made to sleep without his mattress for four days. As to the June 14, 2010 incident, Peterson claims the Defendants "set him up" to be assaulted by returning him to G Unit and that he was denied medical attention for his injuries. Peterson makes two additional arguments. First, he argues that Monroe County's payment of his hospitalization bills is evidence of the Defendants' liability in this case.[9] Second, he argues that, on November 13, 2012 – about two years after his October 21, 2010 release from the Monroe County jail – an individual named Michael Green was arrested for allegedly pointing a loaded shotgun at Peterson. [37 at 9]. Peterson claims that Green was taken to the Jail, where Defendants allegedly "rewarded" him by praising him and giving him extra blankets and food.

---

[9] This is a non-issue as the County (at least initially, before certain charge-backs) pays medical bills for those in its custody regardless of who caused the medical need. [32, Ex. C at "0095").

He claims this shows the Defendants' "revenge, rage, malicious intents & deliberate indifference" to Peterson. [*Id.*].[10]

### iv.    Peterson's Proposed Amended Complaint

On May 20, 2013, Peterson, now acting *pro se*, filed a document entitled "Complaint and Jury Demand," against Monroe County, Circuit Judges Joseph A. Costello, Jr. and Michael W. LaBeau, as well as psychiatrist Mark Weliver. [27]. Because Peterson was acting *pro se* at the time, the Court will construe this document as a motion to amend his complaint. [*See also, id.* at 33]. Peterson's proposed amendments are difficult to comprehend. He seems to take exception with Judge Costello's appointment of certain attorneys to represent him in his underlying criminal case, and claims that Judge Costello held "corrupt" hearings after Peterson moved for the Judge's removal. Peterson apparently attempted to appeal Judge Costello's rulings to Chief Judge LaBeau, who, in a most gracious letter (and then in subsequent orders), advised Peterson that he lacked the authority to review Judge Costello's rulings. [27 at 21]. Peterson's allegations against psychiatrist Weliver are largely incomprehensible, but Weliver appears to have prepared a competency report in connection with Peterson's underlying criminal action that Peterson takes issue with. Defendants opposed Peterson's motion to amend his complaint, essentially arguing futility based on this Court's lack of jurisdiction to review his criminal case, absolute judicial

---

[10] It does appear from records in the docket that Mr. Green was arrested and held at the Jail overnight in connection with the incident Peterson described. [47 at 20-31]. In his response papers Peterson claims to attach an "affidavit" from Green supporting Defendants' alleged conduct upon his arrest. Green's "affidavit," however, is unsigned. [38 at 6]. Peterson also attached the signed affidavit of his wife, Michelle Trueblood, who contacted police to report the incident between Peterson and Green. She avers that she later heard Green tell Peterson about the alleged adulations from Defendants. [38 at 8]. A Monroe County Deputy reported that Green made similar statements to him. [47 at 29]. The Court need not delve further into this issue because, even if Green's hearsay statements were admissible and truthful, they would not bear on the issues in this case – the Defendants' actions and states of mind almost two years prior.

immunity for the two judges he seeks to sue, and the fact that Peterson alleged no wrongdoing by Weliver. [31].

### B.    Standard of Review

Federal Rule of Civil Procedure 56 provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001), *quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558, *quoting Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.

1989).  Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id*., *quoting Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009).  "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id*. at 560, *citing Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004).

The United States Supreme Court has made clear that video evidence substantiating one party's version of events can serve as controlling evidence at the summary judgment stage.  *Scott v. Harris*, 550 U.S. 372, 380–381 (2007).  In *Scott*, the Court considered video evidence that came from a camera inside a police car, and allowed that evidence to resolve the parties' conflicting factual accounts.  *Id*. at 380.  The Court refused to accept the plaintiff's version of the events because they were directly contradicted by the video evidence.  *Id*.  The Court held that "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*.

Pursuant to Federal Rule of Civil Procedure 15(a)(2), a party may amend its complaint by leave of the court, and leave to amend "shall be freely given when justice so requires." However, leave to amend should be denied where "the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011).

### C.    Analysis

#### i.    Peterson's Excessive Force Claims Related to the January 30, 2010 Incident (Counts I and III) Should be Dismissed

Peterson claims that Lee's conduct related to the January 30, 2010 incident violated his right to be free from the use of excessive force under the Fourteenth Amendment (Count I) and

also under the Eighth Amendment (Count III).  Because Peterson was a pretrial detainee during

the incident in question, his excessive force claim should be analyzed only under the Fourteenth

Amendment Due Process Clause, and his Eighth Amendment claims should be dismissed.

*Graham v Connor*, 490 US 386 (1989) ("The Fourteenth Amendment "protects a pretrial

detainee from the use of excessive force that amounts to punishment.").  *See also, Harrell v.*

*Grainger County, Tenn.*, 391 Fed. Appx. 519, 522 (6th Cir. 2010) ("The Eighth Amendment

forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting

with 'deliberate indifference' toward the inmate's serious medical needs."  The Due Process

Clause of the Fourteenth Amendment extends the protection of the Eighth Amendment to pretrial

detainees such as Plaintiff.") (internal citations omitted); *Barber v. City of Salem, Ohio*, 953 F.2d

232, 235 (6th Cir. 1992) ("While a pretrial detainee does not enjoy protection of the Eighth

Amendment, the Eighth Amendment rights of prisoners are analogous to pretrial detainees' due

process rights under the Fourteenth Amendment.").

   The Sixth Circuit has held that "[e]very malevolent touch by a prison guard does not give

rise to an [excessive force] cause of action and a prisoner must allege that he sustained more than

de minimis injury in order to state a viable excessive force claim."  *Richmond v. Settles*, 450 Fed.

Appx. 448, 454 (6th Cir. 2011).  As the U.S. Supreme Court explained in *Bell v Wolfish*, 441 US

520, 539 (1979) (quoting *U.S. v. Lovett*, 328 US 303, 324 (1946) (Frankfurter, J. concurring

opinion):

> "The fact that harm is inflicted by governmental authority does not make it
> punishment.   Figuratively speaking all discomforting actions may be
> deemed punishment because it deprives of what otherwise would be
> enjoyed.   But there may be reasons other than punitive for such
> deprivation."

   The Supreme Court has also held "there is, of course, a de minimis level of imposition

11

with which the constitution is not concerned." *Ingraham v Wright*, 430 US 651, 674 (1977).

The record before the Court clearly shows that Officer Lee did not use "excessive force" on Peterson or result in more than a *de minimus* injury. The Court has viewed the videotape of the incident multiple times. [32, Ex. E]. As noted above, it shows Lee making a nudging motion with his foot which did not cause any noticeable reaction whatsoever by Peterson. Certainly, had Peterson been struck with a "direct blow," or any kind of significant force by Officer Lee's "boot," one would have expected to see some sort of immediate startled reaction by him, as he claimed in his deposition testimony. [32, Ex. B at 28-29, 32]. The force used therefore did not "shock the conscience" and was not unconstitutionally excessive. *Burgess v. Fischer*, 735 F.3d 462, 473 (6th Cir. 2013). Moreover, any injury Peterson suffered was, at best, *de minimus*. The documentary records and testimony showed that Peterson had no visible injury to his head and received only aspirin, *see supra* at 4, and Peterson himself testified that he declined to go to the medical cell where he could have received additional treatment. *Id.*

Because the force used was not excessive, and because Peterson has shown at most a *de minimus* injury, his excessive force claims fail and should be dismissed.

### ii.     Peterson's Deliberate Indifference Claims to a Serious Medical Need (Counts II and IV) Should be Dismissed

Peterson claims that Defendants acted with deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment (Count II) and Eighth Amendment (Count IV).[11] The Sixth Circuit recently discussed the standards that apply to such claims:

> The deliberate indifference to serious medical needs of prisoners—e.g., the failure to respond to medical needs, intentional denial or delay of medical care, or intentional interference with a prescribed treatment—constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth

---

[11] As noted above, *supra* at 11, Peterson, as a pretrial detainee, cannot proceed under the Eighth Amendment. Accordingly, Count IV of his complaint should be dismissed.

Amendment.  The Fourteenth Amendment's Due Process Clause governs such claims presented by pretrial detainees, but "are analyzed under the same rubric as Eighth Amendment claims brought by prisoners.

We employ a two-prong test with objective and subjective components to assess such claims.  First, we determine whether the plaintiff had a "'sufficiently serious' medical need" under the objective prong.  A medical need is sufficiently serious if it has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment.  Second, we determine whether the defendant had a "'sufficiently culpable state of mind'" in denying medical care under the subjective prong.  There must be a showing of more than mere negligence, but something less than specific intent to harm or knowledge that harm will result is required.  The defendant must have "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs."  Where the plaintiff has received some medical treatment, "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  However, it is possible for the treatment provided to be "so woefully inadequate as to amount to no treatment at all."

*Burgess*, 735 F.3d at 476 (internal citations omitted).

The record here makes clear that, at least as to the subjective prong, Peterson cannot prevail on his deliberate indifference claim.[12]

### a.    A Question of Fact Exists as to the Objective Prong

As noted above, to satisfy the objective prong of the deliberate indifference test, Peterson must show a medical need that either "has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment."  *Burgess*, 735 F.3d at 476.  Peterson has presented enough evidence to at least raise a question of fact as to the seriousness of his injuries from the June 2010 incident.  Although the

---

[12] Peterson does not specifically identify which medical needs he believes are in issue.  However, the Court has already found that the January 30, 2010 incident resulted in at most a de *minimus* injury, which does not rise to the level of a serious medical need.  *Portis v. Caruso*, No. 09-846, 2010 WL 3609364, at *13 (W.D. Mich. July 28, 2010).  Moreover, Defendants Talley and Massengill provided Peterson with medical care in connection with that incident, and he turned down an opportunity for additional medical care.  *See supra* at 4.  Accordingly, the Court will focus on Peterson's alleged medical needs related to the June 14, 2010 incident.

documentary evidence indicates that Peterson did not seek immediate medical attention [32, Ex. O], Peterson testified that he did ask for medical care before he was taken to an isolation cell, that he "couldn't hardly breathe," and that he "was begging the [unidentified] officer to take [him] to the hospital" hourly throughout the night.   [32, Ex. B at 90-91].   There, he was diagnosed with a broken rib and pneumothorax which ultimately required him to stay in the hospital for five days.   On this record the Court cannot conclude that Peterson's injury did not amount to a serious medical need.

### b.     Peterson Cannot Meet the Subjective Prong

Peterson, however, cannot satisfy the subjective prong of the deliberate indifference test with respect to the named Defendants.   To meet the subjective prong, a plaintiff must demonstrate that a prison official knew of and disregarded an excessive risk to inmate health or safety by showing that (1) the official was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, and (2) the official actually drew the inference.   *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).   Thus, "deliberate indifference describes a state of mind more blameworthy than negligence," and requires "more than ordinary lack of due care for the prisoner's interests or safety."   *Id.* at 835 (internal citations omitted). "[A]ccidents, mistakes, and other types of negligence are not constitutional violations merely because the victim is a prisoner."   *Bigelow v. McQuiggin*, 2012 WL 113818, at *4 (W.D. Mich. Jan. 13, 2012).   In sum, to establish that Defendants acted with deliberate indifference, Peterson must "present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'"   *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 829, 847).   Peterson, in responding to Defendants' summary judgment motion, failed to satisfy

his burden.

First, the Court notes that Peterson does not say, either in his complaint or his testimony, exactly which of the Defendants he believes acted with deliberate indifference to his medical needs related to the June 14th incident.  [32, Ex. B at 91].  Indeed, the extensive record before the Court regarding this incident [32, Ex. O] shows that none of the individual Defendants had any direct involvement with Peterson's initial medical care or lack thereof after the incident.  That is consistent with their claim that they were not working at the Jail at the time, a point which Peterson did not dispute.  [32 at 12].  Rather, the reports show that Officer Metz (who is not a defendant in this case) assisted Peterson in tending to his visible injuries, including by providing antibiotic ointment and band aids.  [32, Ex. O at 15].  Defendant Talley simply received a report of the incident when she arrived the next morning.  [*Id.*].  If anything, the undisputed fact that Peterson was then sent to a hospital for x-rays belies any claim of deliberate indifference against her.

In sum, Peterson has presented no evidence whatsoever that any of the individual Defendants played any role in connection with whatever medical care he did or did not receive.  That alone is sufficient grounds for dismissing Peterson's deliberate indifference claims against the individual Defendants.  *See supra* at 9-10.  Dismissal is also proper because Peterson has not shown that any person (let alone any of the named Defendants) actually drew the conclusion that he needed immediate medical care in the immediate aftermath of the fight.  *Farmer*, 511 U.S. at 837.  Finally, the record shows that it was only a few hours between Peterson's fight with the other inmate and his transportation to the hospital for x-rays.  This short delay, some of which owed to the fact that Peterson was receiving other treatment and being questioned about the incident, simply does not rise to the level of a constitutional deprivation where Peterson has not

15

presented evidence of any detrimental effect on his health due to the delay. *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

For all of these reasons, Peterson's deliberate indifference claims should be dismissed.

### iii.  Peterson's Conditions of Confinement Claim (Count V) Should be Dismissed

In Count V, Peterson challenges, under the Eighth Amendment, the allegedly "inhumane" "conditions of confinement" he was subjected to at the Monroe County Jail, though he does not specify any condition in particular.   As explained above, however, as a pre-trial detainee, Peterson "does not enjoy protection of the Eighth Amendment…"  *Supra* at 11; *Barber*, 953 F.2d at 235.  This is sufficient grounds for dismissing his Eighth Amendment claim.  However, even construing Peterson's claim as arising under the Fourteenth Amendment's Due Process Clause, *Thompson v. County of Medina*, 29 F.3d 238, 242 (6th Cir.1994) (pretrial detainee's challenge to his conditions of confinement are analyzed under the Eighth Amendment), it clearly fails.

"The Eighth Amendment has been construed generally to proscribe disproportionate punishments, *Weems v. United States*, 217 U.S. 349, 366-67 (1910), "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion), and conduct repugnant to "evolving standards of decency," *Trop v.. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion).  The Amendment therefore imposes a duty upon prison officials to provide humane conditions of confinement.  *See Farmer*, 511 U.S. at 832. Prison officials must also "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Id.* at 832-33 (citations omitted).  *See also Davis v. Brian*, 182 F.3d 916 (6th Cir. 1999).  As with his other Fourteenth Amendment claims, Peterson's conditions of confinement claim requires that he satisfy both the objective and subjective tests.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  The objective component requires

16

him to show a deprivation so serious that he was denied "the minimal civilized measure of life's necessities," while the subjective component requires him to show that the prison officials acted wantonly, with deliberate indifference to his serious needs.  *Rhodes v. Chapman*, 452 U.S. 345-46 (1981).

Peterson does not identify exactly which conditions of his confinement he is challenging. However, liberally construing his complaint, the Court sees two potential challenges (other than to the medical care he received, which issue the Court has already discussed): (1) that his mattress was taken away from him for four days; and (2) that he was placed into G Unit by guards who allegedly knew it would be unsafe for him.  Neither claim has merit.

### a.      Taking Peterson's Mattress for Four Days

Immediately following the January 30, 2010 incident in which Peterson claims he was kicked by Lee, Lee removed Peterson's mattress.  [32, Ex. E; *id.*, Ex. L at 20].  Lee testified that it was his intention to withhold the mat only for a day [32, Ex. L at 20, 25], but Peterson claims he was without the mat for four days.  [Cplt., ¶ 16].  This is not a material dispute of fact because the Sixth Circuit has held that withholding a mattress from an inmate for even a two-week period does not violate his Eighth Amendment rights; such a deprivation is simply not sufficiently serious to satisfy the requisite objective component.  *Jones v. Toombs*, 92-00829, 1996 WL 67750, at *1-2 (6th Cir. Feb. 15, 1996).  Indeed, the *Jones* court, *id.*, cited the Ninth Circuit case of *Schroeder v. Kaplan*, 93-17123, 1995 WL 398878, at *2 (9th Cir. July 7, 1995), which held that requiring a prisoner to sleep on the floor for a four-week period without use of a mattress did not violate the Eighth Amendment.

Peterson also cannot satisfy the subjective component against Defendant Lee, the only Defendant at issue with respect to the removal of Peterson's mat.  Peterson testified that the

Jail's rules, which he was familiar with, prohibited inmates from using their mats in that manner. [32, Ex. B at 24].  He also admitted that he had not received specific permission to sleep on the mat outside of his cell during the detention in question, but rather merely "assumed" he could do so because he had been allowed to do so during a prior detention.  [*Id.* at 20].  And, Defendant Lee's unrefuted testimony is that he ordered the mat's removal only for a 24 hour period.  [32, Ex. L at 20-25].  On these facts, Peterson cannot satisfy the subjective element of the deliberate indifference standard.

### b.        Transferring Peterson into G Unit

To succeed on his claim regarding the transfer into G Unit, Peterson must show that the Defendants acted with deliberate indifference to his safety.  *See Farmer*, 511 U.S. at 828, 834. Under the subjective and objective standards discussed above, Peterson cannot meet establish liability against the Defendants for many reasons.  First, it is noteworthy that Peterson was transferred for a legitimate purpose – "tension in dayroom K" where he had been residing.  [32, Ex. I].  Second, it was non-party Officer Jan Ford, not any of the Defendants, who transferred Peterson into G Unit.  [*Id.*]; *see also supra* fns. 5 and 6.  Third, Peterson admits that he did not submit a kite asking to be moved out of G Unit.  [32, Ex. B at 145].  Finally, Peterson had been in G Unit for more than a month when he was attacked by the other inmates, and he testified that he had not previously had any problems with those individuals.  [*Id.* at 70-76].  For all of these reasons, Peterson has failed to establish any link or causal effect whatsoever between his transfer into G Unit and the attack.[13]   He therefore cannot establish either prong of the deliberate indifference test.

---

[13] For the same reasons Peterson's argument that his alleged identification as a "snitch" at the time of his transfer back to the G Unit [32, Ex. B at 76] cannot support his claim.

      **iv.**     **Peterson's Policy/Custom Claims Against the County (Count VI) Should Be Dismissed**

In Count VI of his complaint, entitled "Monroe County's Constitutional Violations," Peterson alleges that the County "acted recklessly and/or with deliberate indifference when it practiced and/or permitted customs and/or policies and/or practices that resulted in constitutional violations to Plaintiff." However, the only purported "custom," "policy" or "practice" identified by Peterson is the County's alleged failure to train and/or supervise its officers in the use of excessive force. (Cplt., ¶ 61). For the reasons explained above, *supra* at 10-12, Peterson cannot show he was subjected to any excessive force. Therefore, his claims against the County must fail. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

      **v.**     **Peterson's State Law Claims (Count VII) Should be Dismissed**

In Count VII of his complaint, Peterson alleges "gross negligence" by each of the individual Defendants. However, he does not identify any conduct in particular which he is challenging. These claims are ripe for dismissal on numerous fronts. First, Defendants are correct that Peterson cannot simply label an alleged intentional act as "gross negligence" in order to create a new or additional claim. In *Parker ex rel Peters v. School Dist. of City of Pontiac*, 2013 WL 1316742, at *6 (Mich. App. Apr. 2, 2013), the Michigan Court of Appeals explained: "'Elements of intentional torts may not be transformed into gross negligence claims.' If a plaintiff's claim of gross negligence is 'fully premised' on a claim of excessive force, then the gross negligence claim should be dismissed." (Quoting *Norris v. Lincoln Park Police Officers*, 292 Mich. App. 574, 578 (2011) and citing *VanVorous v. Burmeister*, 262 Mich. App. 467, 483 (2004). Accordingly, any challenged "excessive force" conduct by the Defendants cannot

support Peterson's gross negligence claims.  *Id.*

Second, Peterson cannot satisfy the elements of his gross negligence claims.  To prevail on a gross negligence claim, Peterson must show "conduct that is so reckless that it demonstrates a substantial lack of concern for whether an injury results."  *Woodman v. Kera, LLC*, 280 Mich. App. 125, 152 (2008) (citing *Xu v. Gay*, 257 Mich. App. 263, 269 (2003).  "Evidence of ordinary negligence is insufficient to create a material question of fact regarding the existence of gross negligence."  *Id.* (citing Maiden v. Rozwood, 461 Mich. 109, 122-123 (1999)).  The Court, under the same factual analyses discussed above, finds that there is simply no evidence that any of the named Defendants showed a "substantial lack of concern" about Peterson's conditions of confinement or medical needs.  Peterson was not harmed in connection with the January 30, 2010 incident with Lee, and he was promptly attended to by the other Defendants.  None of the Defendants appear to have had anything to do with the June 14, 2010 incident, and even if they did, the fact that Peterson was in G Unit for over a month without experiencing any problems with the inmates who attacked him belies any suggestion that placing him in that Unit was a grossly negligent act.  Peterson also received medical attention throughout his detention, one time even being hospitalized for five consecutive days as a result of the June 2010 incident.  Accordingly, at best his allegations sound in ordinary negligence, and thus his gross negligence claims should be dismissed.

### vi.   Peterson's Motion to Amend his Complaint Should be Denied

The Court now turns to Peterson's motion to amend his complaint.  [27].  Although Fed. R. Civ. P. 15(a)(2) provides that leave to amend "shall be freely given when justice so requires," such leave should be denied where "the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile."  *Carson v. U.S.*

20

*Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011).  Peterson's motion to amend should be denied for numerous reasons.

First, because all of the proposed claims against Judges Costello and LaBeau clearly arose in connection with the discharge of their judicial duties, each is entitled to absolute judicial immunity from suit, making the claims against them futile.  *Leech v. DeWeese*, 689 F.3d 538, 542 (6th Cir. 2012) ("It is well-established that judges enjoy judicial immunity from suits arising out of the performance of their judicial functions.  State judges enjoy absolute immunity from liability under 42 U.S.C. § 1983.  Judicial immunity exists even where a judge acts corruptly or with malice.").  Second, Peterson makes no specific allegations of wrongdoing whatsoever against Monroe County or Weliver, and this Court is not required to "create a claim which [a plaintiff] has not spelled out in his pleading."  *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975).  Finally, even if Peterson could allege sufficient facts to support plausible claims, it would not be appropriate for him to do so in this civil action which relates to events that occurred at the Jail during his pretrial detention.  *See Cage v. Harry*, 2010 WL 1254562, at *1 (W.D. Mich. Mar. 26, 2010); *Dockery v. Wetzel*, 2013 WL 664931, at *3 (M.D. Pa. Feb. 22, 2013).  For all of these reasons, Peterson's motion to amend [27] should be denied.

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment [32] be **GRANTED**, that Peterson's Motion to Amend his Complaint [27] be **DENIED**, and that Peterson's complaint be **DISMISSED** in its entirety.

Dated: December 16, 2013                    s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 16, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager
